1

2

3                    **UNITED STATES DISTRICT COURT**

4                         **DISTRICT OF OREGON**

5                        **PORTLAND DIVISION**

6  KAREN SALAZAR,                        )
                                         )
7            Plaintiff,                   )    No. 03:10-cv-00895-HU
                                         )
8  vs.                                    )
                                         )
9  MICHAEL J. ASTRUE,                     )   **FINDINGS AND RECOMMENDATION**
   Commissioner of Social Security,       )
10                                        )
             Defendant.                   )
11

12          _____

13  Tim D. Wilborn
    Wilborn Law Office, P.C.
14  P.O. Box 2768
    Oregon City, OR 97045
15
          Attorney for Plaintiff
16

17  S. Amanda Marshall
    United States Attorney
18  Adrian L. Brown
    Assistant United States Attorney
19  1000 S.W. Third Avenue, Suite 600
    Portland, OR 97204-2904
20

21  David Morado
    Regional Chief Counsel
22  Seattle, Region X
    Gerald J. Hill
23  Special Assistant United States Attorney
    Office of the General Counsel
24  Social Security Administration
    701 5th Avenue, Suite 2900 M/S 221A
25  Seattle, WA 98104-7075

26          Attorneys for Defendant

27

28

1 - FINDINGS AND RECOMMENDATION

HUBEL, United States Magistrate Judge:

The plaintiff Karen Salazar seeks judicial review pursuant to 42 U.S.C. § 405(g) of the Commissioner's final decision denying her application for Disability Insurance ("DI") benefits under Title II of the Social Security Act, 42 U.S.C. § 1381 *et seq.* Salazar argues the Administrative Law Judge ("ALJ") erred in failing to include all of her restrictions in his hypothetical question to the Vocational Expert, in discounting her subjective complaints and finding her allegations not to be fully credible, in rejecting the opinions of Salazar's treating Nurse Practitioner Kevin Probst, and in finding she has transferable skills. *See* Dkt. ##17 & 19.

## I. *PROCEDURAL BACKGROUND*

Salazar protectively filed her application for DI benefits on October 10, 2005, at age 42, claiming a disability onset date of June 14, 2005. (A.R. 14, 30, 74-76, 105[1]) She later amended her alleged disability onset date to September 30, 2005. (A.R. 14, 29) Her application was denied initially and on reconsideration. (A.R. 44-54) Salazar requested a hearing, and a hearing was held before

---

[1]The administrative record was filed electronically using the court's CM/ECF system. Dkt. #13 and attachments. Pages of the record contain three separate page numbers: two located at the top of the page, consisting of the CM/ECF number (e.g., Dkt. #13-5, Page 24 of 29); a Page ID#; and a page number located at the lower right corner of the page, representing the numbering inserted by the Agency. Citations herein to "A.R." refer to the agency numbering in the lower right corner of each page.

2 - FINDINGS AND RECOMMENDATION

1   an ALJ on January 20, 2009.  (A.R. 23-43)  On March 4, 2009, the

2   ALJ found that although Salazar has severe impairments consisting

3   of rheumatoid arthritis and asthma, her impairments do not meet the

4   Listing level of severity, and she retains the capacity to perform

5   sedentary work such as telephone solicitor, and telephone answering

6   service operator.  The ALJ therefore concluded Salazar was not

7   disabled at any time through the date of his decision.  (A.R. 14-

8   22)

9      Salazar requested review, and submitted additional evidence

10  that was considered by the Appeals Council.  (*See* A.R. 5)   On

11  May 28, 2000, the Appeals Council denied Salazar's request for

12  review, making the ALJ's decision the final decision of the

13  Commissioner. (A.R. 2-4)

14     Salazar filed a timely Complaint in this court, requesting

15  judicial review.  Dkt. #1.  The matter is fully briefed, and the

16  undersigned submits the following Findings and Recommendation for

17  disposition of the case pursuant to 28 U.S.C. § 636(b)(1)(B).

18

19                 ***II.  FACTUAL BACKGROUND***

20             ***A.  Summary of the Medical Evidence***

21     Salazar saw Nurse Practitioner ("NP") Pat Turley on June 2,

22  1999, with complaints of aches and pains all over her body, and

23  shoulder pain for several months.  She specifically complained of

24  pain in her hands and feet.  No redness or swelling was observed in

25  any of her areas of concern.  She complained of pain with movement

26  of her shoulders.  The progress notes are incomplete with regard to

27  any treatment that was provided.  (A.R. 261-62)

28

  3 - FINDINGS AND RECOMMENDATION

1    On June 17, 1999, Salazar saw William L. Melcher, M.D., a
2  specialist in Rheumatology and Internal Medicine, for an Outpatient
3  Rheumatology Consultation, due to her complaints of "[j]oint aches
4  and pains and swelling." (A.R. 258)   After his examination,
5  Dr. Melcher's impression was, "Seropositive rheumatoid arthritis -
6  the patient has a chronic arthropathy of the hands and feet as well
7  as multiple other joints with a positive serum rheumatoid factor."
8  (*Id.*; see A.R. 259)  The doctor discussed with Salazar "the chronic
9  nature" of her condition, "and how nonsteroidal anti-inflammatory
10 drugs are only minimally effective and the use of disease modifying
11 agents as treatment." (*Id.*)   He wanted to avoid prescribing
12 steroids, if possible, due to the potential side effects.  Salazar
13 was advised to cease breast-feeding her son due to the medications
14 she would be prescribed for the arthritis.  X-rays were ordered for
15 further evaluation.  She was given information on various medica-
16 tions and a pool exercise program.  She was directed to return for
17 followup in one week to begin treatment, and then again in three
18 months to assess her response to the new medications. (*Id.*)  X-rays
19 of Salazar's hands showed "[n]o radiographic evidence of any of the
20 arthritides." (A.R. 263)

21    On August 24, 2000, Salazar saw Dr. Melcher for review of a
22 supplement she was taking for rheumatoid arthritis; i.e., Arthro-7.
23 Notes indicate the supplement did not contain glucosamine or
24 chondroitin sulfate, but it contained Vitamin C, "chicken
25 cartilage, and MSM among other ingredients." (A.R. 256)  At some
26 point in August 2000, Salazar was started on hydroxychloroquine.
27 She experienced hair loss with the medication, so it was stopped.
28 However, since stopping the medication, her symptoms of pain,

4 - FINDINGS AND RECOMMENDATION

1  swelling, and morning stiffness had improved. (*See* undated
2  progress note at A.R. 260; A.R. 248, indicating Salazar was started
3  on the hydroxychloroquine in August 2000)

4      On January 17, 2001, Salazar saw John A. McDonald, M.D., an
5  Occupational Health specialist, with a complaint of a low back
6  injury the day before that "occurred when she was lifting heavy
7  ramps from behind [a] vehicle." (A.R. 256) She immediately felt
8  soreness, which worsened over the next 24 hours. She complained of
9  pain across her lower back area, with no radiculopathy. She moved
10  guardedly, sat "with great discomfort," and had limited ranges of
11  motion and tenderness in her lumbar spine. She was diagnosed with
12  an acute lumbosacral strain. Physical therapy was ordered, and she
13  was given prescriptions for Ibuprofen 600 mg three times daily and
14  Flexeril 10 mg as needed at night. She was placed on work restric-
15  tions including "minimal stooping, twisting or bending, no pushing,
16  pulling or lifting over ten pounds. No repetitive lifting over
17  five pounds. No vehicle driving." (*Id.*) She was directed to
18  return in one week for followup. (*Id.*)

19      Salazar saw Dr. McDonald on January 24, 2001, for followup.
20  Notes indicate she moved "around the room, on and off the exam
21  table without distress," and she was "able to squat, forward flex,
22  touching both hands on the floor and raising independently without
23  discomfort." (A.R. 255) She was deemed "medically stationary
24  without impairment," and she was released to return to "regular
25  work." (*Id.*; A.R. 249)

26  / / /

27  / / /

28  / / /

5 - FINDINGS AND RECOMMENDATION

1    Salazar saw Dr. Melcher for followup in August of 2001.[2]  She

2  was taking Vioxx "about 3 times a week for pain," and also was

3  taking glucosamine and chondroitin, which she believed was helping

4  her.   Upon examination, she had no signs of synovitis and her

5  rheumatoid  arthritis  appeared  to  be  under  control.   She  was

6  directed to continue on her current medications, and return for

7  followup in one year, or earlier if her symptoms worsened.  If she

8  was doing well in one year, the plan was for her to return only as

9  needed.  (A.R. 260)

10    On July 8, 2002, Salazar saw NP Kevin N. Probst, a Nurse

11  Practitioner in Dr. Melcher's office, for an outpatient rheuma-

12  tology consultation.  NP Probst recited the following history of

13  Salazar's condition:

14          [Salazar] is a pleasant 39-year-old Caucasian
           female,  who  was  diagnosed  with  rheumatoid
15          arthritis in approximately 1999.  She started
           noticing  problems  approximately  a  few  years
16          ago, after the birth of her son, with pain in
           her shoulders, later in her feet.  When she
17          would walk on hard surfaces for any length of
           time, her feet would be throbbing.  She was
18          seen  by  her  primary  care  physician  and  a
           rheumatoid factor came back quite elevated.
19          Since that time the patient has had intermit-
           tent symptoms.  She has had problem[s] with
20          pain and stiffness in her hands and wrists at
           times.   Sometimes  her  knees  will  swell.
21          Mostly the left knee, which swelled substan-
           tially this past weekend; it is better today.
22          She has had foot metatarsal and ankle pain.
           Aching shoulders on occasion as well.  The
23          patient was tried on hydroxychloroquine back
           in August 2000.  She noted problems with
24          feeling increased stiffness, hair loss and
           general light-headedness and weakness.  She

25

26

27    [2]The progress note is undated, but indicates he had seen
   Salazar "1 year ago" when she was started on hydroxychloroquine.
28  (A.R. 260)

6 - FINDINGS AND RECOMMENDATION

> finds that her arthritis is better after a two-month trial of this was discontinued.
>
> The patient has again been having problems with an increased pain in the last several months. She works as a bus driver and this has made it more difficult for her to continue . . . with these activities.

(A.R. 248) Salazar's medications at this time were Ibuprofen 600 mg three times daily, with only minimal effect; Depo-Provera injections for contraception; Paxil 20 mg daily; Levothroid; and Arthro-7, an over-the-counter anti-inflammatory drug.

Upon examination, NP Probst noted no significant swelling or deformities. Salazar had "a good strong grip bilaterally." (*Id.*) She complained of tenderness across her feet and mild tenderness over both knees with palpation. X-rays taken in 1998 showed "no erosive changes," and were considered normal at that time. (A.R. 249) NP Probst made the following assessment: "Patient with arthralgias and high rheumatoid titer at 322 most likely represents rheumatoid arthritis that has become active again." (*Id.*) After discussing Salazar's case with the treatment team, a trial of Sulfasalamine was prescribed. She also was given "a temporary prescription for low dose prednisone, to get her by." (*Id.*) Additional lab tests also were ordered, as well as a chest x-ray and updated x-rays of her hands. (*Id.*)

The x-rays of Salazar's hands and wrists were unremarkable. (A.R. 253) X-rays of her cervical spine showed a "bony spur . . . at the inferior endplate anteriorly at C3," but otherwise the x-rays were normal. (A.R. 252) The chest x-ray also was unremarkable. (A.R. 254)

7 - FINDINGS AND RECOMMENDATION

On July 17, 2002, Salazar saw a Nurse Practitioner named "Jim" with a complaint of neck pain that developed when she awoke early in the morning.  Her upper posterior neck was sore to the touch, painful with movement, and she felt a tingling sensation. Examination revealed no deformities or swelling in her neck, and full ranges of motion of her cervical spine, although full extension provoked pain and muscle spasm.  She was diagnosed with a cervical strain, and was treated with medication.  (A.R. 246-47)

On August 19, 2002, Salazar saw NP Probst for followup of her rheumatoid arthritis.  She reported that her symptoms were improved on the Sulfasalamine.  Her joint function was good, and her medication was continued without change.  (A.R. 246)

Salazar saw NP Probst on January 9, 2003, for followup of her rheumatoid arthritis.  She reported increased symptoms "all over," and "difficulties driving the school bus now from the pain."  (A.R. 245)  Her joints were noted to be puffy and tender, with weak grip strength, and painful shoulders and knees on range of motion testing.  Another medication was added, and prednisone also was prescribed.  (*Id.*)

On February 18, 2003, Salazar saw NP Probst for followup of her rheumatoid arthritis.  She complained of "persistent AM stiffness and multiple joint pains" despite starting a new medication five weeks earlier.  She also was taking prednisone, and occasional Vicodin at night for pain.  She was continuing to drive a school bus, but stated it was difficult.  Her joints were mildly swollen and tender, and she exhibited mildly decreased range of motion in her shoulders.  Lab tests were ordered, and notes

8 - FINDINGS AND RECOMMENDATION

1  indicate Salazar would be referred to a rheumatology clinic for
2  occupation/physical therapy.  (A.R. 244-45)

3      On March 12, 2003, Salazar was seen in the Rheumatology Clinic
4  for followup of her rheumatoid arthritis.[3]  She reportedly was
5  "starting to do better finally" on her medications.  She was
6  "[m]ore agile and able to perform at work better."  (A.R. 244)

7      Salazar saw NP Probst on August 12, 2003, for followup of her
8  rheumatoid arthritis.  She was not improving on her medication and
9  was "[s]till very stiff and sore in the hands, wrist, elbows,
10 shoulders, knees and feet."  (A.R. 243)  Her joints were observed
11 to be mildly swollen and tender.  NP Probst prescribed Enbrel[4], and
12 made Salazar an appointment for instruction in self-administering
13 the drug.  (*Id.*)

14     On September 11, 2003, Salazar was seen by a nurse to start
15 her on Enbrel.  She was shown a video on mixing and injecting the
16 drug, and was instructed on how to dispose of her needles properly.
17 She was given an Enbrel dosing kit to take home.  (A.R. 243)

18     On May 4, 2004, Salazar saw Daisy T. Kuchinad, M.D., a
19 specialist in Internal Medicine, for depression and a medication
20 check.  Salazar was noted to be "[v]ery tearful," and "suffering
21 from severe depression . . . [and] under severe psychosocial

22

---

23      [3]The progress note does not indicate who saw Salazar,
24 indicating only that the provider was the Rheumatology Clinic.
   (A.R. 244)
25
        [4]Enbrel is a brand name for the drug etanercept, which is an
26 injectable medication "indicated for reducing signs and symptoms,
   inducing major clinical response, inhibiting the progression of
27 structural damage, and improving physical function in patients with
   moderately to severly active rheumatoid arthritis (RA)."
28 http://www.rxlist.com/enbrel-drug.htm (visited 01/11/2012).

9 - FINDINGS AND RECOMMENDATION

1   stress." (A.R. 241)  She also was noted to have "severe rheumatoid
2   arthritis," for which she was taking Enbrel, "an exorbitantly
3   expensive drug." (*Id.*)  Salazar reported problems sleeping at
4   night, noting she snored a lot, and tiredness throughout the day.
5   She had been denied for bariatric surgery, and she was "very
6   tearful and angry about that." (*Id.*)  On examination, her heart
7   rate was regular, and her extremities had no edema.  Prozac was
8   prescribed for the depression. (*Id.*)

9       On June 8, 2004, Salazar saw NP Turley in the Pulmonology
10  Clinic for evaluation of possible sleep apnea.  Salazar stated she
11  had snored for many years. She did not feel rested upon awakening,
12  and she was sleepy throughout the day.  She was shown a "Sleep
13  video," and was instructed not to drive while she was sleepy.
14  (A.R. 240)

15      On June 17, 2004, Salazar was seen by Robert Unican, M.D. in
16  the Pulmonology Clinic's Sleep Lab, for an outpatient sleep study
17  consultation for suspected sleep apnea. She was observed for
18  several hours.  After using a CPAP, her oxygen saturation improved
19  and Salazar "reported feeling better rested than usual upon
20  awakening." (A.R. 239)  She was diagnosed with "possible upper
21  airway resistance syndrome (UARS)." (*Id.*) Recommended therapy was
22  use of a CPAP, which was dispensed to her. (*Id.*)

23      On June 21, 2004, Salazar saw NP Probst for followup of her
24  rheumatoid arthritis.  She reported that her symptoms were stable
25  on Enbrel weekly injections.  (A.R. 238)

26  / / /
27  / / /
28  / / /

10 - FINDINGS AND RECOMMENDATION

1    On March 22, 2005, Salazar spoke with Dr. Kuchinad by phone

2 regarding the status of her bronchitis.[5]  Notes indicate she was

3 "much improved," her cough was improved, and she had no fever.

4 (A.R. 238)  On April 26, 2005, Salazar saw Dr. Kuchinad for

5 followup of "asthmatic bronchitis."  She reported feeling much

6 better.  She was swimming twice a week and had lost a little

7 weight.  (A.R. 236)

8    Salazar saw NP Probst on July 14, 2005, for followup of her

9 rheumatoid arthritis.  (A.R. 235-36)  She reported that she was

10 having difficulty driving a school bus due to pain in her hips and

11 knees.  She was having pain despite using Enbrel to treat her

12 arthritis.  She was "considering applying for disability," noting

13 that even a four-hour work day left her "[t]horoughly exhausted."

14 (A.R. 236)  NP Probst added Arava[6] to Salazar's medication regimen,

15 continued her on Enbrel for arthritis, and continued her on

16 tramadol as needed for pain.  (*Id.*)

17    On August 11, 2005, Salazar saw NP Probst for followup of her

18 rheumatoid arthritis.  She reported that she was "still symptomatic

19 with chronic pain, stiffness and swelling to multiple joints."

20 (A.R. 235)  She still had pain in her hands, wrists, shoulders,

21 hips, and knees, but she no longer was having "flares" since she

22 had started taking the Arava.  She experienced mild nausea from the

23

24    [5]There are no progress notes from a previous visit where
Salazar was seen initially for this bronchitis attack.

25

26    [6]Arava is a brand name of the drug leflunomide, administered
in tablet form, "indicated in adults for the treatment of
27 rheumatoid arthritis (RA): (1) to reduce signs and symptoms[;] (2)
to inhibit structural damage as evidenced by X-ray erosions and
joint space narrowing[; and] (3) to improve physical function[.]"
28 http://www.rxlist.com/arava-drug.htm (visited 01/11/2012).

11 - FINDINGS AND RECOMMENDATION

1 medication, but indicated it was tolerable.  Salazar indicated she
2 was considering filing a disability application, but she wanted to
3 wait until she resumed working in September to see if she was able
4 to tolerate working.  Her arthritis medications included Arava and
5 Enbrel, as well as tramadol as needed for pain.  (*Id.*)

6     On October 4, 2005, Salazar saw NP Probst for followup of her
7 rheumatoid arthritis.  Salazar stated she was still having signifi-
8 cant pain despite her use of Enbrel and Arava.  She wanted to apply
9 for disability due to "[d]isabling multiple joint pain and
10 stiffness."  (A.R. 234)  Examination revealed some swelling and
11 tenderness across her wrists, hands, knees, ankles, and feet.
12 (A.R. 235)  NP Probst authored a "Clinician's Report of Disability"
13 stating Salazar had a diagnosis of rheumatoid arthritis, and
14 although medications had helped her to some degree, she
15 nevertheless had "ongoing disabling arthritis," and Probst
16 "consider[ed] her to be indefinitely disabled as of 10/3/05."
17 (A.R. 187)

18     On January 9, 2006, psychiatrist Nancy Cloak, M.D. met with
19 Salazar for forty-five minutes to perform a consultative mental
20 status evaluation.  (A.R. 188-91)  Salazar reported some symptoms
21 of depression when she experienced severe arthritis-related pain,
22 but overall she felt much better than she had in the early 1990s,
23 when she was treated for depression.  She was taking Paxil,
24 prescribed by her family doctor.  She had not tried any other
25 psychotropic medications and had not had psychotherapy.

26     Salazar gave a history of a diagnosis of polyarticular
27 arthritis in the early 1990s, which had continued since that time,
28 and was at the point where it affected most of her joints and

12 - FINDINGS AND RECOMMENDATION

interfered with her ability to work and to perform household tasks. She also had obstructive sleep apnea for which she used a CPAP machine, and she reported a history of hypothyroidism and frequent cold sores.

Salazar reported the following activities of daily living and social functioning:

> [She] awakens around 6:00 a.m. and gets up around 6:40 to get her children ready for school. She then showers and does light housework interspersed with naps.
>
> She can stand for approximately 10 minutes only. She is able to sit for longer periods if she is able to move around.
>
> She is no longer able to do her quilting, a formerly enjoyed hobby nor is she able to vacuum or mop floors. Her children do most of the housework. However, she is independent with respect to meals, finances, shopping, and transportation.
>
> . . . Her social support is from five good friends from work, although she rarely goes out socially. This is limited due to pain. Her family is in Arizona.

(A.R. 188-89)

Dr. Cloak diagnosed Salazar with "Major depressive disorder, single episode, in partial remission, mild." (A.R. 191) She opined Salazar would be able to handle benefits if they were awarded, "based on generally intact judgment and cognitive functioning." (*Id.*) She indicated Salazar "is able to understand and remember instructions, sustain concentration and attention, persist in tasks, and engage in appropriate social interactions." (*Id.*) In the doctor's opinion, Salazar would have "no barriers to job performance from a psychiatric standpoint." (*Id.*)

13 - FINDINGS AND RECOMMENDATION

1    On January 19, 2006, psychologist Frank Lahman, Ph.D. reviewed
2  the record and completed a Psychiatric Review Technique form.
3  (A.R. 192-205) He evaluated Salazar under Listing 12.04, for
4  Depression, finding Salazar would have a mild degree of limitation
5  in all areas, with no episodes of decompensation. (*Id.*)  In his
6  notes in support of his conclusion that Salazar's depression is
7  non-severe, Dr. Lahman repeated Dr. Cloak's findings almost
8  verbatim.  (A.R. 204)

9    On January 19, 2006, Dr. Melcher saw Salazar for a medication
10 review.    The doctor noted NP Probst had "completed som[e]
11 disability paperwork for [Salazar] in past that needs an MD
12 signature so I have agreed to cosign this for him[.]"  (A.R. 206)
13 The doctor prescribed water aerobics for Salazar's arthritis.
14 (*Id.*; A.R. 208)

15    On January 20, 2006, Mary Ann Westfall, M.D., a specialist in
16 Physical Medicine and Rehabilitation, reviewed the record and
17 completed a Physical Residual Functional Capacity Assessment form.
18 (A.R. 209-16)  She opined Salazar could lift twenty pounds
19 occasionally and ten pounds frequently; sit and stand/walk for
20 about six hours each in an eight-hour workday; and push/pull
21 without limitation.  She opined Salazar would have no other work-
22 related physical limitations.  (*Id.*)  She indicated Salazar would
23 be capable of "light level" functioning.  (A.R. 216)

24    On June 13, 2006, Salazar saw Ginny Laferriere, a Nurse
25 Practitioner in Internal Medicine, "to establish, discuss impact of
26 weight on management of health issues and concern over increasing
27 depression."  (A.R. 233)  Salazar also indicated an interest in
28 bariatric surgery. (*Id.*)  Salazar stated she had been overweight

14 - FINDINGS AND RECOMMENDATION

1  since her mid 20s.  She had tried several weight management
2  programs with no lasting weight loss.  She stated she currently had
3  "limited ability to be active due to arthritis pain," and she had
4  been unable to work for the past year "due to disability."  (*Id.*)
5  She was referred to a surgeon for evaluation, and encouraged to
6  enroll in a weight management program.  Her Paxil dosage was
7  increased due to her report of increased symptoms of depression,
8  including depressed mood, and agitation/anger.  (*Id.*)

9      On June 28, 2006, William Habjan, D.O., a family practitioner,
10 reviewed the record and completed a Physical Residual Functional
11 Capacity Assessment form.  (A.R. 223-30)  Dr. Habjan's opinion was
12 identical to Dr. Westfall's January 2006 assessment with one
13 exception; i.e., Dr. Habjan opined Salazar should avoid concen-
14 trated exposure to fumes, odors, dusts, gases, etc.  (A.R. 227)
15 Dr. Habjan indicated Salazar's subjective complaints were "only
16 partially credible," noting her alleged symptoms and limitations
17 were "in excess of what is objectively supported." (A.R. 228)  He
18 noted Salazar's "statements are exaggerated, [i.e.] she [complains
19 of] arthritis pain everywhere, including in her head and all the
20 way to her toes.  She says she can only walk 1/2 block and stand 10
21 minutes and needs to use the electric scooter cart at the groc[ery]
22 store.  These limitations are not [consistent with] the [medical
23 evidence of record] showing only 1 occasion of swelling in her
24 joints since [her alleged onset date of October 2005].  She has
25 normal strength and no gait deficit.  [Activities of daily living]
26 show she is able to drive, fix meals, do [housekeeping] chores, and
27 take care of her kids."  (*Id.*)

28

15 - FINDINGS AND RECOMMENDATION

1    Specifically with regard to NP Probst's October 2005 letter

2  stating Salazar "has disabling arthritis and he considered her

3  indefinitely disabled," Dr. Habjan noted the following:

4            This opinion is given no weight for several
             reasons.  It is inconsistent [with] objective
5            medical findings.  Mr. Probst did not define
             "disabled."   He did not state any specific
6            functional limitations.   The conclusion of
             disabled is reserved for the Commissioner of
7            SSA.   This source is not an acceptable MER
             source.

8

9  (A.R. 229)   Dr. Habjan concluded Salazar's primary limiting

10 condition "is morbid obesity.  She has been diagnosed with

11 [rheumatoid arthritis] in the past but there is little clinical

12 evidence of active or chronic manifestations of this [disease].  It

13 is reasonable that [she] is limited to light exertion.  She should

14 also avoid concentrated exposure to respiratory irritants to

15 prevent asthma [symptoms]."  (A.R. 230)

16    On June 29, 2006, psychologist Robert Henry, Ph.D. reviewed

17 the record and prepared a "Mental Summary."  (A.R. 231)  He noted

18 Salazar had not alleged significant mental limitations, so her

19 credibility was not at issue in that regard.  (*Id.*)  Salazar has

20 little psychiatric history.  She has been taking Paxil, but has had

21 no other treatment.  He found the evidence of record did not

22 indicate Salazar has a severe mental impairment, and he affirmed

23 Dr. Cloak's findings regarding Salazar's mental functional

24 capacity.  (*Id.*)

25    On June 30, 2006, Salazar saw John H. Ellison, M.D., a

26 Gastroenterology and Internal Medicine specialist, for a consulta-

27 tive examination.  (A.R. 217-22)   He found Salazar to be a

28 "questionable historian."  (A.R. 217)   The doctor's review of

16 - FINDINGS AND RECOMMENDATION

1  Salazar's medical records indicated she had been treated in the

2  past for "rheumatoid arthritis, depression, hypersomnia, cellulitis

3  of a foot, hypothyroidism and tracheobronchitis." (*Id.*) Salazar

4  described the impact of her arthritis on her activities of daily

5  living as follows:

6             She says her "house is not clean" but she
             tries to do a little housework and cooking.
7             She rides a cart in stores. She is able to
             drive a car and get around to a limited extent
8             on foot. She is able to take care of personal
             needs such as dressing and bathing although
9             may ask one of her children to help a little.

10  (*Id.*)

11       Salazar was self-administering an Enbrel injection twice

12  weekly. She took oxycodone as needed for pain, indicating she did

13  not need the medication every day. She used an albuterol inhaler

14  for asthma, took Paxil for depression, and took a thyroid hormone.

15  She also took acyclovir as needed for cold sores. (*Id.*)

16       Salazar would not allow the doctor to check her pedal pulses

17  "because of apparent extreme tenderness on touching [her] feet."

18  (A.R. 219)  While checking the range of motion of Salazar's

19  shoulders, the doctor noted, "Limitations are apparently due to

20  pain and are remarkably symmetrical, with abduction limited to 90

21  degrees, adduction 15 degrees, extension 20 degrees, and flexion 90

22  degrees, all on both sides." (*Id.*) Salazar would not attempt

23  "walking tandem or on heels or toes," indicating she knew this

24  would hurt her feet and hips. (*Id.*) She also would not allow the

25  doctor to test her deep tendon reflexes "because of fear of

26  pain/tenderness." (*Id.*)

27       Dr. Ellison's assessment of Salazar included a history of

28  rheumatoid arthritis, unresponsive to steroids but some response to

17 - FINDINGS AND RECOMMENDATION

1  Enbrel, with "no physical findings to support the diagnosis except
2  indirectly[;] [a] deformed pupil, which [Salazar] says has been
3  caused by secondary iritis"; "Chronic depression and apparent
4  overreaction to pain and tenderness suggesting hysteria"; severe
5  obesity; recurrent cold sores; history of frequent pneumonia;
6  thyroid replacement therapy; and seasonal allergic asthma and
7  rhinitis. (*Id.*)  Regarding Salazar's estimated work activities,
8  the doctor indicated the following:

> This is very hard to evaluate because there
> are essentially no objective findings to
> support her reported whole body pain and
> tenderness. The symmetrically limited range
> of motion of both shoulde[r]s seems more
> apparent than real. She states that she can
> stand for only about 10 minutes at a time
> occasionally, and walk for perhaps 1/2 block
> occasionally. She says she is unable to lift
> or carry more than five pounds but seems to be
> able to use her fingers.

15  (A.R. 220)

16      Salazar saw NP Laferriere on September 8, 2006, with a
17  complaint of scaling on her hands following small blister-type
18  lesions on her palms.  She was directed to use moisturizer and
19  triaminicine.  (A.R. 232)

20      On May 4, 2009, NP Probst authored a "Clinician's Report of
21  Work Ability," in which he stated the following:

> [Salazar] is applying for Social Security
> disability. She has sero-positive Rheumatoid
> arthritis which makes it very difficult for
> her to use her small joints (hands) for any
> significant period of time. Even sedentary
> work such as keyboarding or other activities
> grasping would be quite difficult.

27  (A.R. 275)

28

18 - FINDINGS AND RECOMMENDATION

1               **B.   *Summary of the Vocational Evidence***

2        The ALJ asked VE Scott T. Stype to consider an individual 46

3   years old, with a high school education; "the ability to read,

4   write and use numbers"; and Salazar's work history as a school bus

5   driver, defined as a medium strength, semi-skilled occupation.  The

6   hypothetical individual would be limited to sedentary activities.

7   She could stoop, crouch, crawl, kneel, and climb ramps or stairs

8   occasionally, and she should never climb ladders, ropes, or

9   scaffolds.  She should avoid concentrated exposure to dust, fumes,

10  and gases.  (A.R. 40)

11       The VE indicated the hypothetical individual would be unable

12  to return to Salazar's past work as a school bus driver.  (*Id.*)

13  However, he indicated the individual would have some limited

14  transferable skills "in terms of customer service, relationships

15  with parents and teachers and students, communication abilities,

16  safety enforcement of regulations, that type of skill." (A.R. 41)

17  According to the VE, those skills "would transfer to low level

18  semi-skilled occupations in a clerical area," such as telephone

19  solicitor, and telephone answering service operator.  (*Id.*)

20       If Salazar's testimony regarding her impairments and

21  limitations were considered "credible and consistent with medical

22  evidence in the record," she would not be able to perform her past

23  work, nor would she be employable in any other type of work due to

24  her "pain and discomfort, difficulty getting around, [and]

25  unpredictability of symptoms." (A.R. 41-42)  Specifically, if she

26  had to miss two to ten days of work each month, she would be unable

27  to sustain employment.  (A.R. 42)

28

19 - FINDINGS AND RECOMMENDATION

### C.  Salazar's Testimony

#### 1.  Pain Questionnaire

Salazar completed a pain questionnaire regarding her symptoms. (A.R. 139-41)  She stated her pain "goes from a burning, aching to a[n] extreme pain," and is located "anywhere from [her] head to [her] toes."  (A.R. 139)  She has pain daily, and depending on the location of the pain, it may last from several minutes, to days or weeks for severe pain.  She has pain with "standing, walking, lifting, moving, sitting, and sometimes [her] body just starts to hurt for no reason at all."  (*Id.*)  She sometimes gets relief from heat, but not always.  She takes oxycodone when the pain becomes unbearable, but she tries to take it only at night because the medication makes her drowsy and she also is afraid of becoming addicted.  (A.R. 140)

Regarding her mobility, Salazar indicated that on average, she can be active for five to ten minutes before she has to rest.  She is unable to finish household tasks like doing dishes, vacuuming, cleaning, and laundry.  She used to enjoy crocheting, sewing, walking on the beach, dancing, playing pool, shopping, gardening, and working in her yard, but for the most part, she is no longer able to participate in any of these activities.  (*Id.*)  If her hands and arms are not hurting, she can sew for about twenty minutes before her hips hurt enough that she has to stop.  (A.R. 141)  She used to take walks, but now she only walks when she has to.  She uses motorized carts in stores.  She requires help putting on and removing some of her clothing, and she sometimes requires help drying her hair.  She has to rest during grooming activities.  Her children help with household chores.  If she does any cleaning

20 - FINDINGS AND RECOMMENDATION

tasks herself, she has to stop and rest, and it is "very hard for [her] to bend over and pick stuff up." (*Id.*)  She is able to prepare her own meals, usually eating prepared or canned foods. She visits friends or relatives occasionally, and she is able to drive. (*Id.*)

**2.    Function Report**

Salazar completed a Function Report regarding how her condition limits her activities. (A.R. 131-38) She described her daily activities as follows:

> I get up[,] get the kids up[,] sometimes go back to bed[,] try to do some dishes or laundry[,] [and] this takes up all day. Most times I don't get done. I uasullay [sic] take a nap. Kids come home[,] take care of home work[.] [I] start dinner early [but it] usaly [sic] takes time having to stop. I then uasly [sic] go to bed to relax and take my meds.

(A.R. 131)  She stated two of her four children still need help with "showers and everyday life." (A.R. 132)

Salazar stated she used to enjoy riding bikes, dancing, playing basketball, swimming, playing pool, sewing, crocheting, gardening, and planting flowers.  She indicated she "really miss[es]" crocheting. (*Id.*) Her pain makes it hard for her to put on a bra, socks, shoes, and pants, and to put her arms up into shirts.  She can bathe herself, but she has been unable to shave her legs for more than two years.  She can comb her hair if her shoulders and hands are not hurting.  She can feed herself "most of the time if [her] jaw is not hurting or shoulders work." ((*Id.*) She sometimes needs help using the toilet, wiping herself or

21 - FINDINGS AND RECOMMENDATION

1  pulling her pants up. (*Id.; see also* A.R. 35)  She stated that
2  sometimes brushing her teeth is impossible for her. (*Id.*)

3      With regard to meal preparation, she stated either her
4  children help fix the meals or they have frozen dinners or bake-at-
5  home pizza.  Her daughters cook side dishes because she is unable
6  to have all of the food ready at one time.  She stated, "I don't
7  like cooking anymore and I now burn things." (A.R. 133)  She does
8  no yard work at all.  She will do household cleaning that needs to
9  be done "even if it takes all day to do it." (*Id.*)  She stated it
10 takes her all day to clean a room or do laundry.  Her children
11 carry the laundry back and forth, and they help with dishes,
12 picking up, and making beds. (*Id.*)

13     Although Salazar is able to drive, she stated driving is
14 difficult for her, so her daughter drives when she is home.  If a
15 store has motorized carts, Salazar uses them.  Otherwise, her
16 children help with the shopping while she waits in the car.  She is
17 able to handle her own money, pay bills, and count out change.
18 (A.R. 134)  She stated her condition affects her ability to lift,
19 squat, bend, stand, reach, walk, sit, kneel, climb stairs, and use
20 her hands.  If her shoulders are hurting, she is unable to move her
21 arms.  Her hip pain makes it difficult for her to bend, stand, and
22 walk.  Her knees hurt when she walks, drives, kneels, stands, or
23 walks up stairs.  Her hands hurt, making it hard to do things with
24 her hands.  If her feet or hips are hurting, she can only walk "a
25 couple of yards" before she has to stop and rest for ten minutes or
26 more. (A.R. 136)  She does not have trouble getting along with
27 people in a work setting.  She has difficulty dealing with stress,
28

22 - FINDINGS AND RECOMMENDATION

and she takes Paxil for this.   (A.R. 137)   Salazar included the following narrative comments:

> I know it's hard to look at me and know what['s] wrong[.]   [E]ven my freinds [sic] have had a hard time understanding how painful[] my life has been and how hard things are.   To look at me I look like I'm just fat but that['s] not the case.   I wish I could just take my kids to the park[,] go dancing agian [sic], or just go back to work and not have to deal with the pain.   My body feels like it['s] a[t] least a-100 years old and I['m] not.   I use[d] to do water a[e]robics but now that hurts and the pools are to[o] cold.

(A.R. 138)

### 3.   Headache Questionnaire

Salazar completed a headache questionnaire on September 26, 2006.  (A.R. 168-70)  She stated she had been having headaches for about a year, located at the base of her head and by her ear.  She gets a headache about once a week.  She takes extra-strength Advil (Ibuprofen), and stated the headaches usually resolve with medication and sleep.  Lack of sleep and flickering lights, such as a television, make the headaches worse.  During a headache, she is sensitive to light and noise, she feels confused and has difficulty concentrating, and she is irritable or hostile.  When the headache goes away, she feels fatigued and usually goes to sleep for anywhere from forty-five minutes to three hours.  (*Id.*)

### 4.   Salazar's Hearing Testimony

Salazar was 46 years old at the time of the hearing.   She lives in a house with her husband and three of their four children. Her husband is a construction laborer.  Salazar receives long-term

23 - FINDINGS AND RECOMMENDATION

1  disability payments from the Public Employee Retirement System as
2  a result of her work as a school bus driver.  (A.R. 27-29)

3      Salazar has a high school education.  (A.R. 27)  She can read
4  and understand newspaper articles, and she can write notes or
5  letters to people.  She can do simple math.  (A.R. 29)

6      Salazar stated she is unable to work due to pain, stiffness,
7  and "not being able to move when the pain hits." (A.R. 31)  She is
8  able to dress and bathe herself without help about 75% of the time.
9  The other 25% of the time, when the pain is too great, she does not
10 bathe and just stays in her pajamas.  (A.R. 31)  She later stated
11 her children help her with dressing "probably at least 60% of the
12 time." (A.R. 35)  She needs assistance with fastening her bra, and
13 putting on her socks.  (*Id.*)  She does very little housework.  She
14 stated she can load the dishwasher, "but it could take up to an
15 hour or two to finish it[.]"  (A.R. 32)  She can drive a car, but
16 a couple of days a week, she does not feel well enough to drive.
17 She might go to the store for milk or bread, but her husband does
18 most of the shopping.  (*Id.*)

19     On a typical day, Salazar gets her children up and ready for
20 school, if she is able.  If she cannot get up, she calls the kids
21 on their cell phones to get them up and ready.  She loads the
22 dishwasher in the morning and her sons put the dishes away at
23 night.  If she is having a good day, she might go to the store for
24 bread or milk, or look at some things on her computer.  She spends
25 most of her time in a comfortable chair or in bed.  She reads very
26 little, but she does watch television.  She no longer attends any
27 religious activities or services because "it takes too much effort
28

24 - FINDINGS AND RECOMMENDATION

1  to go," the wooden seats are uncomfortable, "and it's just not
2  worth the pain and struggle."  (A.R. 33)

3       Salazar stated she no longer engages in most of her hobbies,
4  but on good days, she "might sew a little bit." (*Id.*)  She can
5  estimated she can lift ten pounds without hurting herself. (*Id.*)
6  She can sit for about forty-five minutes before her legs "get kind
7  of crampy," and she has to get up and move around.  (A.R. 34)  On
8  a good day, she estimated she can stand for about ten minutes, but
9  on most days, she can only stand for a minute or two before she is
10 in pain.  She can walk about half a block before she began having
11 pain.  She noted she had walked a block to get to the ALJ hearing,
12 and her back and hips were in pain from the walk.  She can climb a
13 flight of stairs "[v]ery, very slowly," as long as she either has
14 a handrail or goes up sideways. (*Id.*)  She estimated her current
15 weight at 290.  (A.R. 35)  She has trouble talking on the phone
16 because of pain in her arms, so she uses a speaker phone, but feels
17 she misses out on a lot of the conversation.  (A.R. 39)

18      Salazar estimated she has about ten "bad days" a month, when
19 she stays in bed all day except for using the bathroom.  On these
20 bad days, her children have to help her with her pants in order for
21 her to use the bathroom.  (A.R. 35)

22      Salazar stated she has asthma, which according to her is a
23 side effect of the Enbrel she is taking.[7]  She keeps medications on
24 hand at home to treat asthma attacks, including prednisone, a

25

26      [7]Prescribing information supplied with Enbrel does not
   indicate that asthma is a demonstrated side effect of the
27 medication, although 65% of patients using Enbrel experience upper
   respiratory infections. *See* http://www.rxlist.com/enbrel-drug.htm,
28 "Side Effects and Drug Interactions" (visited 01/11/2012).

rescue inhaler, and a once-daily inhaler.  She has more breathing problems in the winter than at other times, and stated she is often sick in the winter.  She gets sinus infections and colds from November to April, and if she is not diligent in treating them, "it goes into pneumonia."  (A.R. 36-37)

According to Salazar, she also has "nerve damage" in her right knee from the Enbrel that causes intermittent pain and burning. Her medications also cause her mouth to be very dry, so she has to have water with her at all times.  (A.R. 38)  In addition, her pain pills make her "really loopy . . . and it's hard to get . . . [her] brain under control again."  (A.R. 39)  She has difficulty concentrating, and keeping track of a television show.

Salazar stated she has "a very hard time with depression" when her "pain is really bad."  (A.R. 37)  Her pain medications sometimes do not completely alleviate her pain, and after she has been lying in bed for many hours without relief from pain, she sometimes has thoughts of suicide.  She takes Paxil for her depression.

## III.  DISABILITY DETERMINATION AND THE BURDEN OF PROOF

### A.  Legal Standards

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

"Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the

26 - FINDINGS AND RECOMMENDATION

meaning of the Social Security Act." *Keyser v. Commissioner*, 648 F.3d 721, 724 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520).  The Keyser court described the five steps in the process as follows:

> (1) Is the claimant presently working in a substantially gainful activity?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal one of a list of specific impairments described in the regula-tions?  (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Keyser*, 648 F.3d at 724-25 (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)); *see Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1520 (b)-(f) and 416.920 (b)-(f)). The claimant bears the burden of proof for the first four steps in the process.  If the claimant fails to meet the burden at any of those four steps, then the claimant is not disabled. *Bustamante*, 262 F.3d at 953-54; *see Bowen v. Yuckert*, 482 U.S. 137, 140-41, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987); 20 C.F.R. §§ 404.1520(g) and 416.920(g) (setting forth general standards for evaluating disability), 404.1566 and 416.966 (describing "work which exists in the national economy"), and 416.960(c) (discussing how a claimant's vocational background figures into the disability determination).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and word experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999).  If the Commissioner

27 - FINDINGS AND RECOMMENDATION

1 fails meet this burden, then the claimant is disabled, but if the
2 Commissioner proves the claimant is able to perform other work
3 which exists in the national economy, then the claimant is not
4 disabled. *Bustamante*, 262 F.3d at 954 (citing 20 C.F.R.
5 §§ 404.1520(f), 416.920(f); *Tackett*, 180 F.3d at 1098-99).

6      The ALJ determines the credibility of the medical testimony
7 and also resolves any conflicts in the evidence. *Batson v. Comm'r*
8 *of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004) (citing
9 *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)).
10 Ordinarily, the ALJ must give greater weight to the opinions of
11 treating physicians, but the ALJ may disregard treating physicians'
12 opinions where they are "conclusory, brief, and unsupported by the
13 record as a whole, . . . or by objective medical findings." *Id.*
14 (citing *Matney, supra*; *Tonapetyan v. Halter*, 242 F.3d 1144, 1149
15 (9th Cir. 2001)). If the ALJ disregards a treating physician's
16 opinions, "'the ALJ must give specific, legitimate reasons'" for
17 doing so. *Id.* (quoting *Matney*).

18      The law regarding the weight to be given to the opinions of
19 treating physicians is well established. "The opinions of treating
20 physicians are given greater weight than those of examining but
21 non-treating physicians or physicians who only review the record."
22 *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1036 (9th Cir.
23 2003). The *Benton* court quoted with approval from *Lester v.*
24 *Chater*, 81 F.3d 821, 830 (9th Cir. 1995), where the court held as
25 follows:

26          As a general rule, more weight should be given
            to the opinion of a treating source than to
27          the opinion of doctors who do not treat the
            claimant.   At  least  where  the  treating
28          doctor's  opinion  is  not  contradicted  by

28 - FINDINGS AND RECOMMENDATION

> another doctor, it may be rejected only for
> "clear and convincing" reasons. We have also
> held that "clear and convincing" reasons are
> required to reject the treating doctor's
> ultimate conclusions. Even if the treating
> doctor's opinion is contradicted by another
> doctor, the Commissioner may not reject this
> opinion without providing "specific and
> legitimate reasons" supported by substantial
> evidence in the record for so doing.

*Lester*, *supra*.

The ALJ also determines the credibility of the claimant's testimony regarding his or her symptoms:

> In deciding whether to admit a claimant's
> subjective symptom testimony, the ALJ must
> engage in a two-step analysis. *Smolen v.
> Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996).
> Under the first step prescribed by *Smolen*,
> . . . the claimant must produce objective
> medical evidence of underlying "impairment,"
> and must show that the impairment, or a combi-
> nation of impairments, "could reasonably be
> expected to produce pain or other symptoms."
> *Id*. at 1281-82. If this . . . test is satis-
> fied, and if the ALJ's credibility analysis of
> the claimant's testimony shows no malingering,
> then the ALJ may reject the claimant's testi-
> mony about severity of symptoms [only] with
> "specific findings stating clear and con-
> vincing reasons for doing so." *Id*. at 1284.

*Batson*, 359 F.3d at 1196.


## B.  The ALJ's Decision

The ALJ found Salazar has not engaged in substantial gainful activity since her alleged onset date of September 30, 2005, and she met the insured status requirements through December 31, 2010. He found she has severe impairments consisting of rheumatoid arthritis and asthma; however, he further found her impairments, singly or in combination, do not meet the Listing level of severity. (A.R. 16-19) The ALJ found Salazar has the residual

29 - FINDINGS AND RECOMMENDATION

functional capacity ("RFC") "to perform sedentary work as defined in 20 CFR 404.1567(a)[8].    She can occasionally climb ramps or stairs, but should never climb ladders, ropes, or scaffolds.  She can occasionally engage in stooping, crouching, crawling, or kneeling.  She should avoid vibration or concentrated exposure to dust, fumes, and gases."  (A.R. 19)

The ALJ found Salazar's testimony regarding the intensity, persistence, and limiting effects of her symptoms was not credible to the extent it was inconsistent with the above RFC.   The ALJ cited the following reasons for his credibility finding:

> [Salazar] testified to difficulty holding the phone, yet the objective medical evidence presented here does not show any erosive findings on x-rays, and very little swelling or even limited range of motion on examina- tions.  Kaiser Permanente records indicate that her disease is fairly well controlled with the medications she is taking, and her treatment has remained largely unchanged. There appears to be very little treatment after 2006, although she testified she does go in to get her medications refilled.   Her reported limitations at the hearing were much less than those she told Dr. Ellison, who did not find significant physical findings to support any work-related limitations, but did feel there was an apparent over-reaction to pain and tenderness.    The claimant's own testimony indicates an ability to lift 10 pounds and apparently sit most of a day.

_____

[8]"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).
    "Sedentary work generally requires an individual to sit for approximately six hours of an 8 hour day." _Rice v. Chater_, 98 F.3d 1346 (Table), 1996 WL 583605, at *5 n.14 (9th Cir. Oct. 9, 1996).

30 - FINDINGS AND RECOMMENDATION

(A.R. 20)

The ALJ gave NP Probst's opinion regarding Salazar's disability little weight, noting the objective medical evidence does not support a finding that Salazar is disabled.  He further noted, "Additionally, it is not clear if Nurse Probst is talking about [Salazar's] work as a bus driver, or all work."  (A.R. 21) The ALJ relied on Dr. Ellison's "thorough exam," and his lack of "significant physical findings to support any work-related limitations."  (*Id.*)

The ALJ relied on the VE's testimony in concluding Salazar's work as a school bus driver provided her with "skills in communication, relationships, and safety enforcement regulations" which are "transferable to low level semi skilled jobs in the clerical area." (*Id.*)  The ALJ also relied on the examples given by the VE of jobs that a person with Salazar's limitations, as found by the ALJ, could perform; i.e., telephone solicitor, and telephone answering operator.  (A.R. 21-22)  The ALJ therefore concluded Salazar was not disabled at any time through the March 4, 2009, date of the ALJ's decision.  (A.R. 22)


### IV.   STANDARD OF REVIEW

The court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'"  *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)); *accord Black v. Comm'r of Soc. Sec. Admin.*, slip op., 2011 WL 1930418, at *1 (9th Cir. May 20, 2011).  Substantial evidence is '"more than a

31 - FINDINGS AND RECOMMENDATION

1 mere scintilla but less than a preponderance; it is such relevant
2 evidence as a reasonable mind might accept as adequate to support
3 a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035,
4 1039 (9th Cir. 1995)).

5      The court "cannot affirm the Commissioner's decision 'simply
6 by isolating a specific quantum of supporting evidence.'" *Holohan
7 v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett
8 v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1998)).  Instead, the court
9 must consider the entire record, weighing both the evidence that
10 supports the Commissioner's conclusions, and the evidence that
11 detracts from those conclusions.  *Id.*  However, if the evidence as
12 a whole can support more than one rational interpretation, the
13 ALJ's decision must be upheld; the court may not substitute its
14 judgment for the ALJ's.  *Bray*, 554 F.3d at 1222 (citing *Massachi v.
15 Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

16

17                         *V.   DISCUSSION*

18                  *A.   Transferability of Skills*

19      Salazar argues the ALJ erred in finding that she has trans-
20 ferable skills from her past relevant work.  Dkt. #17, pp. 8-11.
21 She argues the "skills identified by the VE and the ALJ do not meet
22 the definition of a 'skill' as described in Social Security Ruling
23 [("SSR")] 82-41."  *Id.*, p. 9.

24      In SSR 82-41, the Commissioner explained what constitutes a
25 "skill":

26               A skill is knowledge of a work activity which
               requires the exercise of significant judgment
27               that goes beyond the carrying out of simple
               job duties and is acquired through performance
28               of an occupation which is above the unskilled

32 - FINDINGS AND RECOMMENDATION

level. . . .  It is practical and familiar
knowledge of the principles and processes of
an art, science or trade, combined with the
ability to apply them in practice in a proper
and approved manner.  This includes activities
like making precise measurements, reading blue
prints, and setting up and operating complex
machinery.  A skill gives a person a special
advantage over unskilled workers in the labor
market.

SSR 82-41(a), 1982 WL 31389, at *2; *see Ball v. Astrue*, slip op.,

No. CV-09-764-HU, 2010 WL 3420166, at *11 (D. Or. Aug. 27, 2010)

(Hubel, M.J.).

The applicable regulations explain when the Commissioner

considers a claimant to have transferable skills:

(1) What we mean by transferable skills.  We
consider you to have skills that can be used
in other jobs, when the skilled or semi-
skilled work activities you did in past work
can be used to meet the requirements of
skilled or semi-skilled work activities of
other jobs or kinds of work.  This depends
largely on the similarity of occupationally
significant work activities among different
jobs.

(2) How we determine skills that can be
transferred to other jobs.  Transferability is
most probable and meaningful among jobs in
which –
        (i) The same or a lesser degree of skill
        is required;
        (ii) The same or similar tools and
        machines are used; and
        (iii) The same or similar raw materials,
        products, processes, or services are
        involved.

(3) Degrees of transferability.  There are
degrees of transferability of skills ranging
from very close similarities to remote and
incidental similarities among jobs.  A com-
plete similarity of all three factors is not
necessary for transferability.  However, when
skills are so specialized or have been
acquired in such an isolated vocational
setting (like many jobs in mining, agricul-
ture, or fishing) that they are not readily

33 - FINDINGS AND RECOMMENDATION

1          usable in other industries, jobs, and work
2          setting, we consider that they are not trans-
           ferable.

3   20 C.F.R. § 404.1568(d)(1)-(3).

4        Salazar argues the "skills" identified by the ALJ are
5   activities involved in the simple carrying out of the job duties of
6   a school bus driver.  She argues "communication, relationships, and
7   safety enforcement regulations," identified as her transferable
8   skills by the ALJ, did not impart to her any special advantage over
9   unskilled workers with regard to the positions of telephone
10  solicitor or answering service operator.  Dkt. #17, p. 9.  The
11  Commissioner argues the ALJ was entitled to rely on the VE's
12  opinion that Salazar had acquired skills as a bus driver that could
13  be transferred to the two jobs identified.  Dkt. #18, p. 9.

14       When it comes to the transferability of skills, an ALJ is
15  required to make particular findings of fact in the written
16  decision, supported with appropriate documentation, regarding what
17  transferable skills a claimant has obtained, and to what jobs those
18  skills are transferable.  *See, e.g.*, *Ball, supra* (citing *Bray v.*
19  *Comm'r*, 554 F.3d 1219, 1224-26 (9th Cir. 2009)).  As the court in
20  *Bray v. Commissioner* observed, SSR 82-41, itself, contemplates that
21  an ALJ will rely on a VE's testimony to determine whether or not a
22  claimant has transferable skills.  *Bray*, 554 F.3d 1219, 1225 (9th
23  Cir. 2009).  The *Bray* court noted that the transferability of
24  skills "is precisely the sort of finding . . . that SSR 82-41
25  requires the ALJ, and not the court, to make.  Long-standing
26  principles of administrative law require us to review the ALJ's
27  decision based on the reasoning and factual findings offered by the
28  ALJ - not *post hoc* rationalizations that attempt to intuit what the

34 - FINDINGS AND RECOMMENDATION

1  adjudicator may have been thinking." *Id.* (citations omitted); *cf.*
2  *Menefee-Arellano v. Astrue*, No. 10-27-AA, 2011 WL 1337347 (D. Or.
3  Apr. 7, 2011) (where VE testifies claimant possessed transferable
4  skills at some point, "a finding and assessment of [claimant's]
5  skills are not appropriate for this court to make. . .. It is the
6  role of the ALJ, not this court, to make such findings.") (citing
7  *Carmickle v. Comm'r*, 533 F.3d 1155, 1167 (9th Cir. 2008)).

8      Here, the court finds no error in the ALJ's finding that
9  Salazar acquired certain general skills in communication and
10 dealing with people that would transfer to the positions of
11 telephone solicitor and telephone answering service operator. *Cf.*
12 *Pinto v. Massanari*, 249 F.3d 840, 846 (9th Cir. 2001) ("The ability
13 to communicate is an important skill to be considered when
14 determining what jobs are available to a claimant."). Further,
15 "[t]he VE's testimony provided the ALJ with substantial evidence of
16 the skill level required in [Salazar's] past relevant work and the
17 particular skills acquired by [her] past relevant work activities."
18 *Ball*, 2010 WL 3420166, at *13. *See id.* (noting that SSR 82-41
19 recognizes the universal applicability of some job skills across
20 industry lines).

21     The ALJ did not err in finding Salazar acquired job skills in
22 her past work as a school bus driver that would transfer to the
23 identified jobs.

24

25            **B.  Weight Given to NP Probst's Opinions**

26     Salazar argues the ALJ and the Appeals Council improperly
27 rejected NP Probst's opinions. She argues that despite the ALJ's
28 statement to the contrary, NP Probst's opinions regarding her

1   limitations are, in fact, supported by the objective medical
2   evidence of record.  In particular, Salazar notes a June 1999 blood
3   test was positive for rheumatoid arthritis, and she had cor-
4   responding joint pain and swelling; later records continued to
5   document pain, stiffness, and swelling in her joints; and later
6   blood tests continued to show the presence of rheumatoid arthritis.
7   *See* Dkt. #17, pp. 12-13.  She notes NP Probst's supervising
8   physician, Dr. Melcher, signed off on NP Probst's report concerning
9   her disability.  *Id.*, p. 12.

10      Salazar further argues NP Probst's report regarding her
11  inability to use her hands for any length of time for activities
12  such as keyboarding is "particularly significant" in light of the
13  ALJ's finding that Salazar is limited to a reduced range of
14  sedentary work.  She argues the Appeals Council's rejection of this
15  finding, consideration of the record as "complete," and failure to
16  remand for further evidence, was error.  *Id.*, pp. 14-15.

17      The Commissioner argues the ALJ provided adequate reasoning
18  germane to NP Probst for dismissing his opinion.  Dkt. #18, p. 7.
19  The Commissioner asserts that NP Probst's opinion regarding
20  Salazar's disability was conclusory and unsupported by objective
21  medical evidence.  He further notes the non-examining physicians'
22  opinions support the ALJ's RFC assessment.  *Id.*, p. 8.

23      The Social Security Administration considers "all of the
24  available evidence" when making a disability determination.  SSR
25  06-03p.  This includes information from "non-medical sources," such
26  as nurse practitioners, physician's assistants, and others.  *Id.*
27  In SSR 06-03p, the Commissioner explained that an "acceptable
28  medical source" must provide evidence to establish the existence of

36 - FINDINGS AND RECOMMENDATION

1 a medically-determinable impairment.  Once an impairment is shown

2 to exist, the agency "may use evidence from 'other sources,' . . .

3 to show the severity of the individual's impairment(s) and how it

4 affects the individual's ability to function."  *Id.*  The Ruling

5 makes it clear that although information from one of these "other

6 sources" cannot establish the existence of a medically-determinable

7 impairment, such information "may be based on special knowledge of

8 the individual and may provide insight into the severity of the

9 impairment(s) and how it affects the individuals' ability to

10 function."  *Id.*

11      The Ruling further observes that the regulations "do not

12 explicitly address how to consider relevant opinions and other

13 evidence from 'other sources'[.]"  *Id.*

14            With the growth of managed health care in
15            recent years and the emphasis on containing
             medical costs, medical sources who are not
16            "acceptable medical sources," such as nurse
             practitioners, physician assistants, and
17            licensed clinical social workers, have
             increasingly assumed a greater percentage of
18            the treatment and evaluation functions
             previously handled primarily by physicians and
19            psychologists.  Opinions from these medical
             sources, who are not technically deemed
20            "acceptable medical sources" under our rules,
             are important and should be evaluated on key
21            issues such as impairment severity and
             functional effects, along with the other
22            relevant evidence in the file.

23            .   .   .

24            Although [the regulations] do not address
             explicitly how to evaluate evidence (including
25            opinions) from "other sources," they do
             require consideration of such evidence when
26            evaluating an "acceptable medical source's"
             opinion.  For example, SSA's regulations
27            include a provision that requires adjudicators
             to consider any other factors brought to our
             attention, or of which we are aware, which
28            tend to support or contradict a medical

37 - FINDINGS AND RECOMMENDATION

> opinion.    Information,  including  opinions,
> from "other sources" -- both medical sources
> and "non-medical sources" -- can be important
> in this regard.  In addition, . . . the Act
> requires us to consider all of the available
> evidence  in  the  individual's  case  record  in
> every case.

SSR 06-03p.

The Policy Interpretation in the Ruling further expands on how this "other source" evidence should be treated.  The same "basic principles" used to evaluate "acceptable medical source" evidence are equally applicable to opinion evidence from "other sources."

> These factors include:
>
> - How  long  the  source  has  known  and  how
>   frequently  the  source  has  seen  the  indi-
>   vidual;
> - How consistent the opinion is with other
>   evidence;
> - The  degree  to  which  the  source  presents
>   relevant evidence to support an opinion;
> - How well the source explains the opinion;
> - Whether  the  source  has  a  specialty  or
>   area  of  expertise  related  to  the  indi-
>   vidual's  impairment(s); and
> - Any other factors that tend to support or
>   refute the opinion.

*Id.*, "Policy Interpretation," ¶ 1.  The Ruling notes that depending on application of these factors in a particular case, the opinion of an "other source" may outweigh the opinion of an "acceptable medical source," for example if the "other source" "has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion."  *Id.*

The Ruling indicates that an adjudicator "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer

1  to follow the adjudicator's reasoning, when such opinions may have
2  an effect on the outcome of the case." *Id.*; *see Tupper v. Astrue*,
3  slip op., No. 3:10-CV-3039-BR, 2011 WL 2710021, at *4 (D. Or.
4  July 12, 2011).  When an ALJ discredits evidence from an "other
5  source," the ALJ must provide "specific reasons, germane to the
6  witness" for doing so.  *Talley v. Astrue*, 400 Fed. Appx. 167, 169
7  (9th Cir. 2010) (citing *Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th
8  Cir. 2006); SSR 06-03p).

9      NP Probst opined that Salazar had "ongoing disabling
10 arthritis," and he "consider[ed] her to be indefinitely disabled as
11 of 10/3/05." (A.R. 187)  The ALJ gave this opinion little weight,
12 finding the objective medical evidence did not support a finding
13 that Salazar was disabled.  (A.R. 22)  The ALJ further found NP
14 Probst's statement to be unclear with regard to whether he believed
15 Salazar to be disabled with regard to her job as a bus driver, or
16 with regard to all work.  (*Id.*)  The Ninth Circuit has observed
17 that a statement by a nurse practitioner, or any other "medical
18 source," indicating a claimant is either disabled or unable to work
19 "is not conclusive and is entitled to no special significance."
20 *Joly v. Astrue*, 357 Fed. Appx. 937, 939 (9th Cir. 2009) (citing 20
21 C.F.R. §§ 404.1527(e), 416.927(e)).

22     The court finds the ALJ did not err in failing to give NP
23 Probst's October 4, 2005, statement greater weight.  Although the
24 objective medical evidence supports Salazar's diagnosis of
25 rheumatoid arthritis, and even her ongoing pain from the disease,
26 NP Probst pointed to nothing in the record at the time of his
27 statement, and the court has located no evidence, to support a
28 finding that Salazar was completely disabled from all work at that

39 - FINDINGS AND RECOMMENDATION

1  point in time.   The ALJ's reliance on Dr. Ellison's contrary
2  findings constituted a "'specific and legitimate reason[]'" for the
3  weight given to NP Probst's opinion.   *See Lester*, 81 F.3d at 830.

4       Salazar further argues, however, that the Appeals Council
5  erred in failing to remand the case after her submission of NP
6  Probst's supplemental statement, dated May 4, 2009, in which he
7  stated Salazar's condition "makes it very difficult for her to use
8  her small joints (hands) for any significant period of time.   Even
9  sedentary work such as keyboarding or other activities grasping
10 would be quite difficult." (A.R. 275)  The Commissioner argues the
11 Appeals Council's decision to deny Salazar's request for review "is
12 not subject to judicial review."    Dkt. #18, p. 9 (citations
13 omitted).  The Commissioner further argues the court cannot remand
14 a disability case for consideration of evidence first submitted to
15 the Appeals Council unless the claimant makes a showing that the
16 new evidence "is material and the claimant had good cause for her
17 failure to submit the evidence to the ALJ in the first instance."
18 *Id.*, p. 10.

19      When the Appeals Council decides not to review an ALJ's
20 decision "after considering the case on the merits; examining the
21 entire record, including the additional material; and concluding
22 that the ALJ's decision was proper and that the additional material
23 failed to 'provide a basis for changing the hearing decision,'" the
24 court will "consider on appeal both the ALJ's decision and the
25 additional material submitted to the Appeals Council." *Ramirez v.*
26 *Shalala*, 8 F.3d 1449, 1452 (9th Cir. 1993) (citing *Bates v.*
27 *Sullivan*, 894 F.2d 1059, 1063-64 (9th Cir. 1990) "(reviewing de
28 novo the Appeals Council's refusal to review the decision of the

40 - FINDINGS AND RECOMMENDATION

1  ALJ where the claimant presented new material to the Appeals
2  Council after the hearing before the ALJ)"; 20 C.F.R. § 404.970(b)
3  "(providing that the Appeals Council shall evaluate the entire
4  record, including new relevant evidence, and shall review the
5  decision of the ALJ if the ALJ's actions, findings, or conclusions
6  are contrary to the weight of the evidence in the entire record)").

7      In the present case, the Appeals Council considered the new
8  evidence submitted after the ALJ hearing, and "found that this
9  information [did] not provide a basis for changing the [ALJ's]
10 decision." (A.R. 3)  The Appeals Council therefore treated the
11 record as complete, and the court does as well.  As a result, the
12 court will consider whether the Appeals Council's rejection of the
13 new evidence was proper.  *See Shaner v. Astrue*, slip op., No. 09-
14 6021-AC, 2010 WL 5789151, at *7 (D. Or. Dec. 28, 2010) (when
15 Appeals Council considers post-hearing evidence and concludes it
16 does not warrant change in ALJ's conclusion, the court considers
17 "both the ALJ's decision and the additional materials submitted to
18 the Appeals Council") (citing *Ramirez*, 8 F.3d at 1452).  In doing
19 so, the court rejects the Commissioner's argument that Salazar must
20 show "good cause" for failing to submit the new evidence until
21 after the ALJ hearing, and that the Appeals Council's denial of
22 Salazar's request for review is "not subject to judicial review."
23 Indeed, the latter argument is perplexing given that the majority
24 of Social Security cases that come before the court for judicial
25 review are presented under identical circumstances, where the
26 Appeals Council has denied a claimant's request for review.

27     Turning to the merits of Salazar's argument, to justify a
28 remand on the basis of NP Probst's supplemental opinion, Salazar

41 - FINDINGS AND RECOMMENDATION

must "demonstrate that there is a 'reasonable possibility' that the new evidence would have changed the outcome of the administrative hearing." *Mayes v. Massanari*, 276 F.3d 453, 462 (9th Cir. 2001) (citing *Booz v. Sec'y of Health & Human Servs.*, 734 F.2d 1378, 1380-81 (9th Cir. 1983)).  The ALJ found Salazar could perform less than the full range of sedentary work.  He noted the medical evidence "does not show any erosive findings on x-rays, and very little swelling or even limited range of motion on examinations." (A.R. 20)  He further noted the record indicates Salazar's treatment protocol "has remained largely unchanged," and her only apparent treatment since 2006 has been continued use of the same medications. *Id.*  Regarding Salazar's testimony that she has difficulty holding a telephone, the ALJ also noted Dr. Ellison's failure to find any work-related limitations.  (A.R. 220)

The record indicates that at the time of Salazar's initial diagnosis with rheumatoid arthritis, in 1999, no redness or swelling was observed in any of her areas of concern.  (A.R. 261-62)  In August 2001, her condition appeared to be under control on her current medications.  (A.R. 260)  in July 2002, NP Probst noted Salazar had "a good strong grip bilaterally," with no significant swelling or deformities.  (A.R. 248)  X-rays of her hands and wrists were unremarkable.  (A.R. 253)  In January 2003, her symptoms had increased, and her joints were noted to be puffy and tender.  In addition, she had weak grip strength.  (A.R. 245) Despite trials of medications, Salazar continued to complain of persistent joint pain and stiffness.  In August 2003, her joints were observed to be mildly swollen and tender, and NP Probst prescribed Enbrel injections.  (A.R. 243)

42 - FINDINGS AND RECOMMENDATION

1    Other than medication checks, Salazar was not seen again for
2  followup of her arthritis until June 21, 2004, when she reported to
3  NP Probst that her symptoms were stable on weekly injections of
4  Enbrel.  (A.R. 238)  She saw NP Probst for followup a year later,
5  on July 14, 2005, and reported increased pain despite her continued
6  use of the Enbrel.  She reportedly was "exhausted" even after a
7  four-hour work day driving a school bus.  (A.R. 236)  She continued
8  to be symptomatic thereafter, despite the addition of Arava to her
9  medication regimen.  NP Probst noted "chronic pain, stiffness and
10 swelling to multiple joints" on August 11, 2005 (A.R. 325), and
11 swelling and tenderness across her wrists, hands, knees, ankles,
12 and feet on October 4, 2005 (A.R. 235).  Despite these treatment
13 notes, and laboratory tests confirming Salazar's rheumatoid
14 arthritis diagnosis, consultants William Habjan, D.O. and John
15 Ellison, M.D. both found the record lacked objective evidence to
16 support the diagnosis.  (*See* A.R. 230; A.R. 219-20)

17    The court finds the consulting physicians' conclusions in this
18 regard to be erroneous.  Both blood tests and objective findings on
19 examination substantiate the rheumatoid arthritis diagnosis, and
20 also provide support for Salazar's testimony regarding her symptoms
21 and limitations.  Because the consultants' conclusions were based
22 on their erroneous finding that no objective evidence in the record
23 supported Salazar's rheumatoid arthritis diagnosis, it was error
24 for the ALJ to rely on the consultants' opinions in formulating
25 Salazar's RFC.  Further, where, as here, a medical source's opinion
26 is supported by objective medical signs and laboratory findings,
27 the opinion is entitled to greater weight.  20 C.F.R.
28 § 404.1527(d)(3).  NP Probst's opinion, with which Dr. Melcher

1 concurs, regarding Salazar's limited ability to use her hands and
2 fingers is consistent with the laboratory tests; treatment notes
3 regarding Salazar's red, swollen joints; and ongoing treatment with
4 medications.   The regulations require that more weight be given to
5 the opinion of a medical source that is consistent with the
6 objective evidence of record.   *Id.*

7      In addition, the court finds the ALJ's reasons for rejecting
8 Salazar's testimony about the severity of her symptoms to be
9 unconvincing.   The ALJ found that Salazar's medically-determinable
10 impairments reasonably could be expected to cause the symptoms she
11 alleges.   (A.R. 20)   Having so found, the ALJ could only reject
12 Salazar's testimony regarding the severity of her symptoms by
13 offering "clear and convincing" reasons for doing so.   *Dodrill v.*
14 *Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *see Cotton v. Bowen*, 799
15 F.2d 1403 (9th Cir. 1986) (same).   Here, the ALJ relied on the
16 consultants' erroneous opinions in rejecting Salazar's subjective
17 pain complaints.   (*See* A.R. 20)   The ALJ also relied on the fact
18 that Salazar failed to seek treatment more often - something the
19 court finds to be insignificant on this record.   Dr. Melcher, a
20 Rheumatology specialist, explained to Salazar the chronic nature of
21 rheumatoid arthritis.   The American Arthritis Association notes,
22 "Rheumatoid arthritis is a chronic disease, meaning it can't be
23 cured[,]" and some people have intermittent symptoms or "flares,"
24 while others have ongoing symptoms that worsen over time.   *See*
25 http://www.arthritis.org/types-what-is-rheumatoid-arthritis.php
26 (visited 01/11/2012); *DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d
27 860, 864 n.1 (4th Cir. 2011) ("Rheumatoid arthritis is 'an
28 inflammatory disease of the joints that causes the joints to swell

44 - FINDINGS AND RECOMMENDATION

1  and to stiffen.  It is a chronic condition, permanent in nature.'")

2  (quoting *Moore v. J.B. Hunt Transp., Inc.*, 221 F.3d 944, 946 (7th

3  Cir. 2000)); *see also Lowe v. Apfel*, 238 F.3d 429 (Table), 2000 WL

4  1290356, at *2 (9th Cir. Sept. 12, 2000) (Kleinfeld, C.J.,

5  dissenting) ("Rheumatoid arthritis, like chronic fatigue syndrome,

6  is characterized by '[s]pontaneous remissions and exacerbations.'")

7  (citation omitted).  The fact that Salazar's condition was stable

8  on her medication regimen, requiring only an annual evaluation to

9  determine whether her dosage levels remained appropriate, does not

10 equate with a finding that she has the residual functional capacity

11 to work.

12    For these reasons, the court finds NP Probst's supplemental

13 report regarding Salazar's limited ability to use her hands and

14 fingers is material.  The two jobs identified by the VE, and cited

15 by the ALJ - telephone answering-service operator and telephone

16 solicitor - both require regular recording of information in some

17 format.  The telephone solicitor/telemarketer job, in particular,

18 requires keyboarding and other tasks requiring frequent use of the

19 hands.  *See DOT* 235.662-026 (telephone answering-service operator)[9]

20 and 299.357-014 (telephone solicitor)[10].

21

22    [9]A telephone-answering-service operator "[o]perates cord or
cordless switchboard to provide answering service for clients.

23 Greets caller and announces name or phone number of client.
Records and delivers messages, furnishes information, accepts

24 orders, and relays calls.  Places telephone calls at request of
client and to locate client in emergencies.  Date stamps and files

25 messages."  *DOT* 235.662-026.

26    [10]A telephone solicitor or telemarketer "[s]olicits orders for
merchandise or services over telephone: Calls prospective customers

27 to explain type of service or merchandise offered.  Quotes prices
and tries to persuade customer to buy, using prepared sales talk.

28                                              (continued...)

45 - FINDINGS AND RECOMMENDATION

1  The court therefore finds the Appeals Council erred in finding
2  NP Probst's supplemental opinion did not provide a basis for
3  changing the ALJ's decision.  Because the opinion was material, the
4  case should have been remanded to the ALJ for further development
5  of the record.  The case also should be remanded based on the ALJ's
6  reliance on the consultants' erroneous reports.

7

8              **C.  *Weight of Salazar's Testimony***

9      Salazar argues the ALJ erred in rejecting her subjective
10 symptom testimony.  She asserts that to the extent the ALJ rejected
11 her pain testimony because he found the medical evidence did not
12 support the level of pain Salazar alleged, "the Ninth Circuit has
13 expressly held that this reason is <u>not</u> a legitimate reason to
14 discount a claimant's pain testimony."  Dkt. #17, p. 16 (citing
15 *Gonzalez v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir. 2990) ("it is
16 the very nature of excess pain to be out of proportion to the
17 medical evidence")).  The court has discussed this issue in the
18 previous section, finding the ALJ failed to support his rejection
19 of Salazar's pain testimony with clear and convincing reasoning.

20     Salazar also argues the ALJ failed to give proper considera-
21 tion to the side effects of her medications.  *Id.*  She notes the
22 ALJ mentioned that Salazar testified her medications make her

23

24      [10](...continued)
25 Records names, addresses, purchases, and reactions of prospects
   solicited.  Refers orders to other workers for filling.  Keys data
26 from order card into computer, using keyboard.  May develop lists
   of prospects from city and telephone directories.  May type report
27 on sales activities.  May contact DRIVER, SALES ROUTE (retail
   trade; wholesale tr.) 292.353-010 to arrange delivery of merchan-
28 dise."  *DOT* 299.357-014.

46 - FINDINGS AND RECOMMENDATION

1  "loopy," affect her ability to concentrate, and sometimes prevent
2  her from tracking a television show, but the ALJ then gave no
3  reasons for rejecting this testimony. Salazar argues her
4  medication side effects are particularly relevant here, where the
5  ALJ identified occupations that would require Salazar to use the
6  telephone for nearly all of the workday. Dkt. #17, pp. 16-17.

7      The Commissioner argues the ALJ provided specific reasons for
8  discounting Salazar's credibility that were consistent with Ninth
9  Circuit precedents. He further argues the ALJ did not reject all
10 of Salazar's testimony, but only that portion that was inconsistent
11 with the ALJ's RFC. He notes the ALJ pointed to specific evidence
12 that undermined the credibility of Salazar's claim that she is
13 disabled from all work. Again, however, as discussed above, the
14 ALJ improperly relied on the consultants' erroneous findings, and
15 also erroneously relied on Salazar's failure to seek more frequent
16 medical treatment.

17      "[I]t is improper as a matter of law to discredit excess pain
18 testimony solely on the ground that it is not fully corroborated by
19 objective medical findings." *Nshanyan v. Shalala*, 70 F.3d 1279
20 (Table), 1995 WL 688871, at *3 (9th Cir. Nov. 20, 1995) (citing
21 *Garner v. Sec'y of Health & Human Servs.*, 815 F.2d 1275, 1279 (9th
22 Cir. 1987)). An ALJ must give clear and convincing reasons for
23 rejecting a claimant's testimony regarding the side effects she
24 experiences from her medications. *See Batson*, 359 F.3d at 1196;
25 *Wilson v. Astrue*, No. CV 10-03217-JEM, 2011 WL 1812501, at *9 (C.D.
26 Cal. May 12, 2011) (citations omitted). In the present case, as in
27 *Varney v. Secretary of Health and Human Services*, 846 F.2d 581 (9th
28 Cir. 1988), although the ALJ noted that the claimant takes certain

1  medications and acknowledged her testimony as to their side
2  effects, the ALJ failed to make clear and convincing findings
3  regarding the side effects, nor did he consider the impact of those
4  side effects on her ability to work. *See Varney*, 846 F.2d at 585.
5  The ALJ also did not include the medication side effects in his
6  hypothetical question to the VE. "Like pain, the side effects of
7  medications can have a significant impact on an individual's
8  ability to work and should figure in the disability determination
9  process. . . . Also like pain, side effects can be a 'highly
10  idiosyncratic phenomenon' and a claimant's testimony as to their
11  limiting effects should not be trivialized." *Id.* (citations
12  omitted). The ALJ's failure to include appropriate findings
13  regarding the side effects of Salazar's medications was error and
14  requires remand.

15      Salazar's work record also supports her credibility. Salazar
16  had a consistent record of substantial gainful activity for at
17  least eighteen years prior to the time she stopped working in 2005.
18  When her symptoms worsened, she made the decision not to apply for
19  disability right away. Instead, she attempted to return to her job
20  as a bus driver to see if she could handle the work despite her
21  symptoms. Only after she determined that she could not tolerate
22  the job did she file her application for DI benefits. *See, e.g.,*
23  *Archer v. Apfel*, 66 Fed. Appx. 121, 122 (9th Cir. 2003) (claimant's
24  "good work history over an extended period is a factor that should
25  have enhanced his credibility"); *compare Thomas v. Barnhart*, 278
26  F.3d 947, 959 (9th Cir. 2002) (holding claimant's "extremely poor
27  work history" showed lack of motivation to work and negatively
28  impacted credibility).

48 - FINDINGS AND RECOMMENDATION

1

### *VI.   CONCLUSION*

2   For   the   reasons   discussed   above,   I   recommend   the

3 Commissioner's decision be reversed, and this case be remanded for

4 further proceedings consistent with this opinion.

5

6

### *VII.   SCHEDULING ORDER*

7   These  Findings  and  Recommendations  will  be  referred  to  a

8 district judge.  Objections, if any, are due by **February 10, 2012.**

9 If no objections are filed, then the Findings and Recommendations

10 will go under advisement on that date.  If objections are filed,

11 then any response is due by **February 27, 2012.**  By the earlier of

12 the response due date or the date a response is filed, the Findings

13 and Recommendations will go under advisement.

14   IT IS SO ORDERED.

15                    Dated this 25th day of January 2012.

16

17                    /s/ Dennis J. Hubel

18                    _____
                     Dennis James Hubel
19                    Unites States Magistrate Judge

20

21

22

23

24

25

26

27

28